**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| TERRENCE M. NORTON, in his capacity as Personal Representative of the Estate of MICHAEL SEAN NORTON<br><br>                    Plaintiff,<br><br>v.<br><br>CITY OF SOUTH PORTLAND, et al.,<br><br>                    Defendants. | )<br>)<br>)<br>)<br>)   Docket no. 2:10-cv-287-GZS<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

Before the Court is Defendants' Motion for Summary Judgment (Docket # 12).  For reasons explained herein, the Court GRANTS the Motion.

**I.       LEGAL STANDARD**

Generally, a party is entitled to summary judgment if, on the record before the Court, it appears "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248. A "material fact" is one that has "the potential to affect the outcome of the suit under the

applicable law." Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 703 (1st Cir. 1993) (citing Anderson, 477 U.S. at 248) (additional citation omitted).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the Court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. Santoni v. Potter, 369 F.3d 594, 598 (1st Cir. 2004).

Once the moving party has made this preliminary showing, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); see also Fed. R. Civ. P. 56(e). "Mere allegations, or conjecture unsupported in the record, are insufficient." Barros-Villahermosa v. United States, -- F.3d --, No. 09-2614, 2011 WL 1447743, at *2 (1st Cir. Apr. 15, 2011) (quoting Rivera-Marcano v. Normeat Royal Dane Quality A/S, 998 F.2d 34, 37 (1st Cir. 1993)); see also Wilson v. Moulison N. Corp., -- F.3d --, No. 10-1387, 2011 WL 977528, at *3 (1st Cir. Mar. 21, 2011) ("A properly supported summary judgment motion cannot be defeated by conclusory allegations, improbable inferences, periphrastic circumlocutions, or rank speculation.") (citations omitted). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." In re Spigel, 260 F.3d 27, 31 (1st Cir. 2001) (quoting In re Ralar Distribs., Inc., 4 F.3d 62, 67 (1st Cir. 1993)).

## II.    FACTUAL BACKGROUND

Plaintiff Terrence Norton brings this case on behalf of the estate of this son, Michael Norton ("Norton").  Michael Norton died on August 25, 2008 as a result of a gunshot wound received during a standoff with the South Portland Police Department at his residence (hereinafter, the "Norton standoff").  At the time of his death, Michael Norton was a 29-year-old man suffering from a mental illness.  He was not a criminal suspect or subject to arrest for any crime.

### A.  The South Portland Police Department, Its Policies, Practices & Personnel

Defendant City of South Portland operates a police department known under the acronym SPPD.  During the relevant time period, the City of South Portland and its employees were provided limited coverage by virtue of the City's membership in the Maine Municipal Association Property & Casualty Pool, a self-funded municipal risk pool.[1]

The South Portland Police Department responded to an average of thirty three thousand eight hundred fifty-one (33,851) calls for service per year from 2003 through 2007.  South Portland police officers effected nine thousand two hundred sixty-seven (9,267) physical arrests during that same time period, an average of approximately seven hundred ninety-three (793) physical arrests per year.  Between 2005 through 2007, South Portland police officers reported

---

[1] Limits for liability coverage for claims arising under the Maine Tort Claims Act can be found on Page 2 of Member Coverage Certificate.

using force a total of three hundred and fifty-eight (358) times, or an average of approximately one hundred-nineteen (119) times per year.[2]

In the five years prior to 2008, the South Portland Police Department investigated ten complaints essentially alleging excessive force by South Portland police officers.  None of the ten complaints of excessive force involved the SPPD's Special Response Team.  One of the ten complaints was initiated internally by the SPPD's Administrative Review Board, during the department's systematic review of every use of force incident.  Three other complaints were initiated by the SPPD's Administration, and two of those were based upon department policy that requires administrative investigation upon the receipt of any Notice of Claim.  The other six complaints were based upon external citizen complaints.  After investigation and review, three cases resulted in supervisory or disciplinary action, including suspensions.  In the other seven complaints, the officers were exonerated.

### 1.   SPPD Personnel Involved in the Norton Standoff

At all times relevant to the Plaintiff's claim, Defendant Edward Googins was employed as Chief of Police for the SPPD, a position he has held for approximately 16 years.  As Chief of Police, Chief Googins has ultimate responsibility for approving the standard operating procedures that are used to guide SPPD officers in various circumstances they may face as police officers, as well as implementing the policies via training and supervision of the officers.  On the night of August 24, 2008, Googins was at the Norton residence and acted as scene commander.

---

[2] By SPPD policy, officers are required to report the use of all "deadly or non-deadly force, to include any physical force greater than un-resisted handcuffing, in writing."  Prior to August 25, 2008, each of those uses of force was reviewed by the department's standing Administrative Review Board, which consists of three Command and Supervisory staff members.

Likewise, Defendant Todd Bernard was employed as a police officer by the City of South Portland at all times relevant to this case. Todd Bernard began working with the South Portland Police Department in 1990. In August, 2008, he held the rank of Lieutenant and was also the Commander of the SPPD's Special Response Team (SRT), which was a team utilized when special weapons or tactics might be needed. On the night of August 24, 2008, Bernard acted as tactical commander at the Norton residence with responsibility for scene tactics and plans.

Defendant Benjamin J. Macisso was also employed as a police officer by the City of South Portland during the relevant time period, having joined the SPPD in 2003. In April 2005, Officer Macisso joined the SPPD SRT. On the night of August 24, 2008, Officer Macisso was at the Norton residence as a member of the SRT. He ultimately fired the shot that killed Michael Norton.

Officer Macisso made 140 physical arrests between 2005 and 2007. Officer Macisso reported using some level of force on twenty-one (21) occasions during these arrests. Officer Macisso had one excessive force complaint during this time; that complaint was internally generated by the Administrative Review Board and not by an external citizen complaint. Officer Macisso was ultimately disciplined for excessive use of force in connection with that complaint.

Scott Corbett was employed as a SPPD Patrol Officer and was also a member of the SRT. As of August 2008, Corbett had worked for SPPD approximately nine years and had been a SRT member for approximately five years.

John Sutton was employed as a SPPD Patrol Officer and was also a member of the SRT. Patricia Maynard was employed as a SPPD Patrol Officer and was on regular patrol on the night in question.

The SPPD maintains a crisis negotiation team that includes Lieutenant Frank Clark, Detective Eric Jesseman and Bob Libby.  Libby and Jesseman are both trained crisis negotiators.

### 2.  SPPD Policies & Procedures

The South Portland Police Department has promulgated Standard Operating Procedures to serve as guidelines for its police officers in many areas, including specifically, arrests, protective custody, handling hostage and barricade incidents, and the lawful use of force in such situations.  These standard operating procedures were in effect prior to August 25, 2008.  In addition, a police officer's lawful use of force is regulated by state statute.  The SPPD Policies regarding use of force were fully compliant with state law on August 25, 2008.  A number of SPPD policies were applicable to the situation giving rise to Norton's claim, including the Use of Force Policy, the Firearms Policy, the Exercising Protective Custody/Mental Health Crisis Intervention Policy, the Hostage/Barricaded Subject Incident Policy, and the Special Response Team Policy.

### 3.  Training Provided to SPPD Officers

All SPPD officers receive training on state and federal laws that govern their conduct, including the lawful use of non-deadly and deadly force; they also receive training regarding all SPPD policies and standard operating procedures.  All officers must also meet annual training requirements of the Maine Criminal Justice Academy in order to maintain their certification as police officers.

Officers assigned to the Special Response Team (SRT) receive additional training regarding special weapons and tactics that may be used by members of the SRT.  Training of

SRT Members includes in-house training, involving both classroom training and scenario-based training in the field, as well as training provided by outside agencies such as the National Tactical Officers Association (NTOA). SRT members receive eight hours of specialized training per month and one 40 consecutive hour block of specialized training per year. In June 2008, Officer Macisso and other members of SRT had attended an 80-hour SWAT training program taught by the NTOA. Notably, SRT members are trained not to take their weapons off "safety" until they are prepared to fire. At that point it essentially becomes one continuous movement to switch the safety to the "fire" position and pull the trigger.[3]

Prior to August 25, 2008, Officer Macisso received training in investigations, lawful arrests, lawful use of both non-deadly and deadly force in connection with arrests, exercising protective custody/mental health crisis intervention, and tactical operations, including but not limited to handling hostage and barricade incidents, among other topics. At the Criminal Justice Academy, the SPPD, and at training from outside agencies such as Caliber Press and the National Tactical Officers Association, Officer Macisso had received training regarding the need to maintain adequate distance from a person armed with an edged weapon. This standard training included videos and studies showing how quickly an average man with an edged weapon can close a distance of approximately 21 feet in an unanticipated attack and how quickly a police officer, would need to react, draw his weapon, aim and fire. Through this training, officers learn that the "21-foot rule" serves as a guideline as to the distance at which an officer might consider deploying deadly force against a person with an edged weapon. Officer Macisso attended the "Street Survival" seminar taught by Calibre Press in February 2008, which seminar includes

---

[3] The Court realizes that there is a genuine issue of material fact regarding whether Officer Corbett, acting as a SRT member, had taken his rifle off safety during the standoff with Norton. (Pls. Response SMF (Docket # 23) ¶¶ 390-393.) Given the factual dispute, the Court's factual discussion is intentionally silent on this issue.

training on edged weapon encounters.  Based on all of his training, Officer Macisso believed that a person with an edged weapon could present an imminent danger to anyone within 21 feet of him.

Officer Macisso does not recall any specific training on "suicide by cop" scenarios prior to August 24, 2008.  However, Officer Macisso's June 2008 SWAT training by NTOA would have included a block of instruction on barricaded subjects, in which "suicide by cop" was discussed.

### 4.  SPPD Policies and Procedures Regarding the Use of Less Lethal Force

In general, "less lethal force" is a term used to describe alternatives to lethal force that law enforcement use to control and subdue combative or violent people.   Standard law enforcement practice calls for the use of a "cover officer" whenever the deployment of less lethal force is planned.  The cover officer is equipped and ready to deploy lethal force in the event that the less lethal weaponry should fail.

On the day in question, SPPD had two forms of "less lethal" force readily available: a bean bag shotgun and Tasers.[4]

A bean bag shotgun is considered "less lethal" force, in that the munitions it uses are not intended to produce fatal results but are intended to induce shock and pain thereby allowing police to take an uncooperative person into custody.  Although a bean bag shot gun is considered "less lethal" force, it fires a projectile propelled by a gunpowder charge from a firearm.  As a result, the use of this weapon was considered deadly force under Maine law as it existed in August 2008.  This limitation in the use of the bean bag shotgun was taught to police officers at

---

[4] The SRT usually has a pepperball gun available but it had been taken out of service for needed repairs and was not available on this day.

both the Maine Criminal Justice Academy and the SPPD.  As a result, at the time, Officer Sutton believed that in order to deploy a bean bag shot against a subject, the use of lethal force first had to be justified.

A Taser is a device that causes temporary neuromuscular incapacitation.  Successful deployment of a Taser depends on a number of factors, including that the weapon works as it is supposed to, the officer manages to strike the suspect with both darts, and good electrical contact is maintained between the two probes.  The experience of the SPPD since Tasers were first issued is that they are most effective at distances of less than fifteen feet although they have a range of up to twenty-one feet.  Given the Taser's limitations, SPPD officers are taught that the appropriate response to a threatened use of an edged weapon at a close distance is the use of deadly force.

Both Officer Macisso and Officer Maynard had Tasers in their possession at the scene of the Norton standoff.  Lieutenant Bernard considered Tasers to be a very effective tool in dealing with mentally disturbed subjects; on the day in question, he was aware that at least Officer Macisso had a Taser.  Lieutenant Bernard gave neither Macisso or the other officers any instructions on the use of Tasers to subdue Norton, nor did he specifically assign a cover officer to any officer with a Taser.

### B.  The Days Leading Up to the Norton Standoff

On Friday, August 22, 2008, SPPD officers were dispatched to the Norton residence located at 745 Main Street in South Portland, Maine although they ultimately had no direct contact with Michael Norton that day.  This dispatch was the result of a call by Dr. Noel Goodman, a psychiatrist who had been treating Norton.  At that time, Dr. Goodman advised that

Norton was suicidal and had reportedly attempted to purchase a shotgun that day to shoot himself.  Dr. Goodman requested that Norton be taken into protective custody as a threat to himself and that he be taken to a psychiatric facility for evaluation and treatment.  Dispatch also received a later call from Connie Nadeau, who identified herself as Norton's employer.  Nadeau expressed serious concern for Norton's well being.  She further indicated that she believed that Norton was in the residence when police had been at the door earlier that evening, but was refusing to respond to any police officers who came to check on him.  After approximately three hours of unsuccessfully attempting to make contact with Norton, and believing they did not have legal justification to force their way into the residence to take him into protective custody, the officers ceased efforts to make contact with Michael Norton that Friday.

On Saturday, August 23, 2008, Dispatch received a call from a psychiatric nurse who expressed concern that Michael Norton was still intent on committing suicide.  The nurse indicated she had spoken with Norton that morning.  As a result of this call, Chief Googins and other SPPD officers again dispatched to Norton's residence.  Following approximately an hour and a half negotiation between Norton and SPPD officers, Norton was talked out of his residence and transported by a SPPD officer to Maine Medical Center for a psychiatric evaluation.

### C.  August 24, 2008

Lieutenant Bernard was informed of the August 22nd and 23rd events involving Norton when he started working as the Shift Commander for the second shift on August 24, 2008.  Lieutenant Bernard was also informed that Norton had attempted to purchase a gun at Cabela's on Friday, August 22, 2008 for the purpose of killing himself, but had been unsuccessful in obtaining the gun because of the waiting period for firearms purchases.

10

On August 24, 2008, at approximately 9:30 p.m., SPPD Dispatch received a telephone call from Michael Norton's father, Plaintiff Terrence Norton (also known as "Terry Norton"). Terry Norton advised that he had spoken with Michael, who had apparently checked himself out of the hospital and had returned to the Norton residence. Michael had professed to Terry that he was going to "finish the deal" and "do it right this time." Terry interpreted Michael's statements that he was going to "finish the deal" and "do it right this time" as an indication that Michael was imminently going to kill himself. Terry Norton described Michael as "agitated."

Dispatch made telephone contact with Michael Norton who advised that he was not coming out of his residence and that police would have to come into his residence if they wanted to speak to him. During this call, the dispatcher learned that there was a female in the house with Norton. In overhearing the female speaking to Norton, the dispatcher felt the female's voice was "shaky." The dispatcher overhead the female tell Norton that she hoped he would not "end it" that night. All of this information was relayed to Lieutenant Bernard.

Lieutenant Bernard, along with other SPPD officers, then went to the Norton residence. The Norton residence is in a neighborhood of homes that are very close together, and the backyard abuts a large apartment complex. In front of the residence is a four-lane road known both as Main Street and Route One. There is a driveway that runs parallel to the house. Shortly after his arrival at the scene, Lieutenant Bernard used a police cruiser to block the driveway so none of the vehicles parked in the driveway of the Norton residence could be driven from the scene. Over the next four hours, SPPD maintained a constant and increasing presence at the Norton residence.

While en route, Bernard called Chief Googins at home to advise him that patrol units were responding to the Norton residence for a male subject who was threatening suicide. Chief

Googins advised Lieutenant Bernard that he would respond to the scene. Chief Googins was familiar with this address and Michael Norton as he had been part of the team that had responded to the August 23, 2008 dispatch to the Norton residence. The initial SPPD response team also included Officer Macisso and Officer Sutton, both of whom were members of the SPPD SRT.

While on patrol the evening of August 24, 2008, Officer Maynard heard other officers being dispatched to the Norton residence to respond to a possible suicidal suspect and she radioed Dispatch to advise that she would also respond to the scene. Officer Maynard was the first officer to arrive on scene and reported her arrival to her supervisor, Lieutenant Bernard, via her radio. Officer Maynard was carrying both her sidearm and a Taser at the time. Lieutenant Bernard instructed Officer Maynard to take up a position at the rear of the residence. Officer Maynard left her cruiser at the rear of the residence and positioned herself behind a large tree for cover. From there, Officer Maynard had a clear view of the rear of the residence and maintained this position for approximately four hours.

Upon Lieutenant Bernard's arrival on the scene, he was advised that a female, later identified as Kari Vance, was inside the residence with Norton. Over the next few hours, SPPD personnel were not able to ascertain with any certainty whether Vance was in the residence voluntarily. As a result, Lieutenant Bernard had to view Vance as a possible hostage. Operating on the necessary assumption that the scene presented a hostage scenario, Lieutenant Bernard positioned the officers at the scene to maintain an effective containment perimeter that would not allow anyone to flee or enter the property.

Upon his arrival at the Norton residence, Officer Macisso was directed by Lieutenant Bernard to take up a position along the driveway that ran beside the Norton residence. Officer Macisso was made aware that there was a female in the residence with Michael Norton, but there

was some question as to whether she was in the residence voluntarily.  Officer Macisso took up position in a tree line that ran alongside the driveway on the opposite side of the driveway from the house.  For the rest of the standoff, Officer Macisso essentially maintained this assigned position from which he could provide containment on the right side and the rear of the house.

Lieutenant Bernard also requested that Bob Libby, a crisis negotiator, respond to the scene.  Upon his arrival at the scene, Libby began attempting phone contact with Norton.  Libby was soon joined at the scene by Lieutenant Frank Clark and Detective Eric Jesseman.  Detective Jesseman arrived at approximately 10:33 p.m.  Jesseman learned prior to arriving at the scene that Norton was barricaded in his home with a woman named Kari Vance; and that Terry Norton, the suicidal suspect's father, had called the police station earlier that evening to report his son was drinking and threatening to "end it right this time" believing that Norton was going to kill himself.  Upon arrival, Jesseman conferred with Libby.  Because it did not appear that Norton was responding to Officer Libby, a decision was made to have Detective Jesseman take over as the negotiator, which proved more effective at establishing communications with Norton.  At approximately 10:43 p.m. Detective Jesseman called Terry Norton who confirmed that the only contact with Norton would be by cell phones, as there was no land line in the house.[5]  During this conversation, Terry Norton informed Detective Jesseman that Michael Norton was drinking, that Michael had been trying to purchase a gun but was refused, and, to his knowledge, did not have a gun.  Terry Norton also expressed his concern about Michael's comment about "doing it right this time."

At approximately 10:15 p.m., shortly after Chief Googins arrived at the scene, Norton's employer, Connie Nadeau, again contacted Dispatch.  Nadeau indicated to Dispatch that Norton

---

[5] Unlike calls made to SPPD dispatch which are recorded, contact by cell phone would mean that there was no way for Detective Jesseman or the SPPD to record the conversations with Michael Norton or Kari Vance at the scene.

had just contacted her by telephone, which surprised her as she believed Norton was still in the psychiatric care facility he had been taken to the previous day by police.  In this phone call, Norton had again told Nadeau that his plan was to commit suicide and he was going to do it by going outside his residence with "something in his hands" that would force the police to shoot him.  Nadeau further advised that Norton was drinking, and mixing his alcohol with medication.

Nadeau also reported that another of her employees, whom she identified as Kari Vance, was inside Norton's residence with him when she spoke to him moments earlier.  Nadeau reported that she had asked Norton to let Vance go outside and speak with the officers, but Norton refused to do so.  When asked by Dispatch if she believed Vance was in the residence of her own free will, Nadeau responded that she did not know, citing to Norton's refusal to let her step outside to speak with the police.  Nadeau further reported that Norton told her that he regretted not forcing the issue with police and "should have ended this" when the police officers were at his residence the previous day, saying that if he "had been aggressive, they would have been aggressive back."  Nadeau had also spoken to Kari Vance regarding the events of Friday, August 22, 2008, and Vance had advised her that on that occasion, Norton had been drinking heavily and had placed a knife on the table.  Nadeau indicated that she was concerned for Vance's safety.  The information provided by Nadeau immediately following her conversation with Norton was passed on to Lieutenant Bernard and, through Lieutenant Bernard, to Chief Googins and the officers on the perimeter outside the residence.  At that time, Chief Googins officially authorized the mobilization of the SRT at the scene.

Officer Corbett received a call at home around 10:15 PM informing him that the SRT was responding to the Norton residence.  Officer Corbett responded to the scene with his SRT gear, including his sidearm, a vest and a rifle.  He did not carry a Taser.  Upon arriving at the

14

scene, Officer Corbett reported to Lieutenant Bernard.  Bernard informed Officer Corbett that Norton was barricaded in the house and instructed Corbett to take up a position at the rear of the residence.  Officer Corbett initially took up a position at the far end of the property line behind a large tree.  About twenty minutes after taking up position at the far end of the property line behind a large tree, Officer Corbett then moved up closer to the residence and positioned himself on the passenger side of a large pickup truck with a dump body.  This truck was parked next to a car in the driveway that ran parallel to the Norton residence.  Officer Corbett remained at this location for the next two to two-and-one-half hours moving back and forth between the tailgate and front passenger door.

A SRT contact team was formed and staged at the front of the residence as SRT members arrived.  The contact team at the front of the residence consisted of Lieutenant Bernard, an officer with a tactical shield, a cover officer armed with a rifle, and Officer Sutton, who was designated to use a shotgun with bean bag rounds.

Officer Sutton initially took up a position at the right front of the residence near a brick wall.  From this position, Officer Sutton was able to observe both the front and right side of the residence.  Ultimately, Officer Sutton was aware that the plan, as communicated by Lieutenant Bernard, was to get Norton and Vance to exit the front of the residence unarmed so that the contact team assembled at the front of the residence could confirm Vance's safety and Norton could be taken into protective custody for transport to a mental health facility.

At Chief Googins' request, the Scarborough Police Department's Command Van arrived at the scene with an additional dispatcher at approximately 11:00 p.m.

At approximately 11:15 p.m., Detective Jesseman advised that Norton had agreed to come outside and talk to him.  Norton agreed to allow officers outside to pat him down when he

exited the residence, provided he could then sit in a vehicle and talk to Jesseman face-to-face. Norton had also agreed to be taken to the hospital for treatment.  After the SPPD team prepared for Norton's exit and Detective Jesseman called Norton to come outside the residence, Norton told Jesseman he had changed his mind and again demanded that Jesseman come inside the residence if he wanted to talk to him.  At this point in time, it was still unclear as to whether Vance was a hostage, and no officers were going to be allowed to enter the residence under the circumstances, as it would be too dangerous.

At 11:27 p.m., Michael Norton called Detective Jesseman's cell phone and advised Jesseman that he had just been released from the hospital.  Detective Jesseman advised Norton that the police needed to speak to him and Vance to ensure they were all right, given the information police had received that he was planning to kill himself.  Detective Jesseman advised Norton of Lieutenant Bernard's request that he come out the front door of the residence where police were waiting for him.  Norton refused and demanded that Detective Jesseman enter the house and speak to him inside.  Detective Jesseman advised Norton that police policy would not allow him to enter the residence under the circumstances.  Following this call, Jesseman informed his supervisors, Lieutenant Bernard, Lieutenant Clark and Chief Googins, about Norton's refusal to come out of the house voluntarily and the supervisors passed this information along to the officers positioned outside the home.

Negotiators eventually lost all contact with Vance and her calls began going directly to voice mail, presumably because the battery in her cell phone had died.[6]  When negotiators asked Norton to let them speak to Vance on his cell phone, he refused to do so.  Norton also advised negotiators that he would not allow Vance to exit the residence to speak with police outside

---

[6] At approximately 12:45 a.m., Chief Googins was notified that Vance's cell phone was no longer working and that Norton refused to allow Vance to use his phone to speak with negotiators.

because the police would not let her come back inside the house.  Throughout this time, Lieutenant Clark acted as the liaison between the negotiators, who were in the command van parked a short distance from the residence, and Chief Googins and Lieutenant Bernard, who were on the property.  Whenever any additional information was obtained, either through the negotiator's direct discussions with Norton or calls from friends or family members of Norton to SPPD dispatch, any relevant information would be passed on to Lieutenant Bernard, who would convey it over the radio to the officers on the perimeter outside the residence.  Lieutenant Bernard also came to the officers' various positions around the perimeter and spoke to them in person.

At approximately 12:20 a.m., Terry Norton again called SPPD Dispatch requesting a status update.  Terry Norton advised Dispatch that he had received a call from Michael approximately thirty minutes earlier.  Terry Norton further advised Dispatch that Michael told him that he and Vance planned to leave the residence and that Michael was going to "get violent" with the police outside the residence.  The information that Michael Norton and Vance were planning to leave the residence and Norton was going to "get violent" with the police outside was relayed to Lieutenant Bernard and, through Lieutenant Bernard, to officers on the perimeter outside the house.  It was around this same time that the officers were also advised by the negotiators that Norton had broken off all negotiations and would no longer answer calls to his cell phone.

### 1.  Vance Exits the Residence

Absent any further phone contact with Norton or Vance, at approximately 1:34 a.m., Lieutenant Bernard began using a cruiser's public address system to broadcast a request directly

to Vance that she come outside the residence and show officers that she was safe.  Officer Macisso could hear Lieutenant Bernard using the public address system of the police cruiser that was parked in the driveway to communicate with Vance.  At approximately 1:40 a.m., Vance exited the residence through the front door.

During the standoff at Norton's residence on the night of August 24-25, 2008, news reporters and cameramen arrived at the scene.  All news people were directed to the parking lot of a business across the street from the Norton residence, for their safety.  The media present included local reporter Lucas Colavecchio from WGME, who was accompanied by a cameraman, as well as a cameraman from the local ABC affiliate, WMTW.  The WMTW cameraman set up his camera and began recording the scene.  Ultimately, the WMTW cameraman recorded more than three hours of video as the standoff continued (hereinafter, the "WMTW video").  The WMTW video captured the events surrounding Vance's exit of the residence and that excerpt of the WMTW video is part of the summary judgment record (the "Vance Exiting Video").

At the very beginning of the Vance Exiting Video, Lieutenant Bernard can be heard advising Vance that they were concerned for her safety, and that they needed her to come out of the residence to speak to them.  Lieutenant Bernard can then be heard instructing Vance to use the front door to exit the residence.  Within seconds, Vance can be seen waving to the officers from inside the front door, which is well-lit.  For the next 30 seconds, Lieutenant Bernard continued to ask Vance to come out the front door advising her that if she did not exit the residence, they would have to assume that something was wrong.  Then, Vance can be seen exiting the front door of the residence.

After Vance exited the residence, she was instructed to walk up the driveway toward waiting police officers.  Vance was first met by Officer Sutton and then walked a short distance to the command van by Lieutenant Bernard.  From his perspective at the bottom of the driveway, Officer Corbett could hear Vance saying that Norton had a knife and had been "crazy all day and night."  On the Vance Exiting Video, Lieutenant Bernard can be seen approaching Vance while speaking on his radio.  Bernard can be seen escorting Vance to the command van, and speaking to her as they walked.  Vance told Lieutenant Bernard that Norton was armed with a knife, was threatening himself, and had cut his neck with the knife, drawing blood.  Vance was brought to the command van where Detective Jesseman spoke to her in an attempt to obtain information about what was happening inside the house.  Just as she had told Lieutenant Bernard, Vance told Detective Jesseman that Norton had cut his neck with a knife, drawing blood.  Vance also told Detective Jesseman that Norton told her to leave because he did not want her to see what was going to happen next.  Detective Jesseman relayed the information about Norton having a knife and cutting his neck to Chief Googins and the other supervisors on the scene.

After Vance exited the command van, Detective Jesseman was briefly able to re-establish contact with Norton inside the residence.  At approximately 1:41 a.m., Norton called Detective Jesseman advising Jesseman that he was "all done," that he was going to come at the police, armed with knives, and that "this was it."  Norton then hung up the phone and ended communication.  Detective Jesseman relayed to Lieutenant Clark the information about Norton's plan to use knives to confront the police.

At approximately 1:44 a.m., Norton's threat to rush at an officer with a knife so police would have to shoot him was relayed to Chief Googins and Lieutenant Bernard.  Lieutenant Bernard, in turn, provided this information via radio to the officers on the perimeter.  In the same

radio communication, Lieutenant Bernard said, "Remember less lethal." This notification would have not only reminded officers involved that a less lethal option was still on the table but also served to prevent possible sympathetic fire from other officers should they hear the bean bag shotgun be fired. Lieutenant Bernard maintained the contact team of SRT members with him at the front door, including an officer with a ballistic shield, Officer Sutton with the bean bag shotgun, and a cover officer with a rifle.

By this point, Officer Sutton had learned that Michael Norton was emotionally disturbed, and had expressed his plan to exit the residence with something in his hands and charge at the officers in an effort to force the officers to shoot him. Sutton also had been informed that Norton was armed with a knife and was threatening to commit "suicide by cop." Likewise, at this point Officer Macisso had received similar radio updates. Officer Macisso understood that Norton had been in some mental health crisis over the past couple days, had threatened suicide, had expressed plans to get violent with police, and that he planned to rush at an officer with a knife. From her position, Officer Maynard had received the same radio updates and understood that Norton planned to leave the house with a knife and be violent.

Based on all of the information they had received, SPPD did not believe that Norton had any firearms. Moreover, with Vance safely out of the Norton residence, SPPD no longer considered the scene a potential hostage situation.

### 2. Norton Exits the Residence

At approximately 1:52 a.m., more than four hours after the standoff began, Lieutenant Bernard began using the PA system to communicate directly with Norton. Lieutenant Bernard requested that Norton come out the front door of the residence to the waiting contact team as

Vance had just done.  At that time, Lieutenant Bernard had not established or communicated any plan regarding the use of force against Norton should he exit out the back of the house, nor had he designated an officer to provide less lethal force in the immediate vicinity behind the house. However, at approximately 1:53 a.m. (one minute after Bernard began using the PA system), Norton suddenly exited the residence through a lower level door in the rear of the residence.

At that time, one SRT member, Officer Corbett, and one patrol officer, Officer Maynard, were directly to the rear of the residence.  Officer Corbett was still in position on the passenger side of the truck, which was parked next to a Cadillac, the vehicle closest to the house.  Officer Corbett was the officer closest to Michael Norton after he exited the house.  Officer Maynard was positioned closer to the treeline and was somewhere between ten and twenty-five feet away from Officer Corbett.  Office Maynard observed Norton exit the residence with a large knife in his left hand.  In response to Norton stepping out from under the porch, Officer Maynard unholstered her sidearm and brought it up to the "low ready position."[7]

Officer Corbett was alerted to Norton's exit from the residence by Officer Maynard. Officer Corbett was forced to step away from his position at the rear of the truck to see Norton and the door from which Norton had emerged.  As he stepped away from the truck, Officer Corbett brought up his rifle and shined the tactical flashlight attached to the rifle on Norton. Officer Corbett observed that Norton had a large, eight-to-ten inch knife with holes in the blade in his left hand.  Norton was also carrying a smaller, utility knife in his right hand.  Officer Corbett observed Norton gesture by bringing his left hand up to his chest and making circles with the knife in the area of his heart, which Corbett interpreted to mean "shoot me here."  It appeared

---

[7] Although Officer Maynard had a Taser with her, she reached for her sidearm because she was being positioned in front of Norton, who was armed with a knife.  Based on her SPPD training, Maynard believed that the response to an imminent threat with an edged weapon at relatively close distances warrants deadly force, and not the Taser.

to Officer Corbett that Norton was carrying out his threat to commit "suicide by cop." From her perspective, Officer Maynard also observed Michael Norton make a gesture in which he circled with his fingers on his chest.

SRT members Officer Macisso and Officer Todd were positioned in a line of trees that ran along the edge of Norton's driveway, on the opposite side of the driveway from the house. Officer Macisso was armed with a rifle and could see Norton as he came out the door. Officer Macisso shined his tactical flashlight at Norton and it appeared to Officer Macisso that Norton was looking directly at him. Macisso saw that Norton had a large knife in his left hand and a smaller knife in his right hand.

In the front of the house, Officer Sutton was alerted to Norton's exit by a radio communication from an officer in the back of the house indicating they had visual contact with Norton. Officer Sutton began hearing officers at the rear of the residence commanding Norton to "drop the knife." It was apparent to the officers in front of the residence that although they could not see Norton, the officers outside the rear of the residence were confronting Norton, armed with a knife.

Using a zoom lense, the WMTW video captured the events surrounding Norton's exit of the residence and that excerpt of the WMTW video is part of the summary judgment record (the "Norton Exiting Video"). A minute into the Norton Exiting Video, an officer can be heard shouting "Put it down!" At this point in the video, the viewer cannot see Michael Norton, nor can you see any of the officers positioned in the rear of the property. In fact, Norton was outside confronting the officers for approximately 40 seconds before he steps far enough beyond the structure of the residence to be seen on the WMTW video.

In response to hearing the officers in the back of the house, Officer Sutton can be seen on the video approaching Lieutenant Bernard in the cruiser from his position at the brick wall. Lieutenant Bernard then exits his cruiser and directs the members of the contact team to the rear of the tree line so that they could reach the back of the house without crossing between Norton and the SRT members who were positioned in the tree line.  Lieutenant Bernard stated on the radio: "Everybody, we have less lethal up, less lethal up."  Based on this radio communication, Officer Macisso believed that Officer Sutton was bringing the bean bag shotgun to the driveway side of Norton's house.

As the contact team moved toward the rear of the residence behind the screen of trees, Lieutenant Bernard continued to hear officers commanding Norton to "Drop the knives" and to "Put them down."  These commands were given periodically throughout the ensuing fifty seconds that Michael Norton remained outside confronting police with knives in hand.  Although more than one officer gave the commands to disarm to Norton, the officers were not speaking simultaneously, and it should have been clear to Norton what they were telling him to do.

After his initial exit, Norton appeared to retreat under the deck.  Officer Corbett estimated that Norton spent ten seconds under the deck before he re-emerged, walking out five feet further into the driveway area and closer to Corbett than he had come previously.  When Norton re-emerged from under the deck, Officer Maynard brought up her sidearm and aimed it at Norton. From his perspective along the tree line, Officer Macisso likewise saw Norton suddenly come out from under the deck and walk in the direction of Officer Corbett still holding knives in each hand with the tips pointed up and out to the side.

Norton is first depicted on the WMTW video as he comes out from underneath an overhanging deck following his initial retreat. (Norton Exiting Video at 1:42.)  On the video,

Norton appears to stop momentarily and look to his left front.  (Norton Exiting Video at 1:45.) After stopping for approximately two seconds, and ignoring continued commands to put the knives down, Norton then resumes moving while holding his arms somewhat out from his body and appearing to nod his head.  However, Norton does not appear to be throwing, thrusting or lunging with either knife.

In response to Norton's resumed movement, Officer Corbett instinctively took a step backward.  By this point in time, Officer Corbett had his rifle aimed at Norton's chest.  From his perspective, Officer Macisso did not see Norton's two-second stop.  Rather, Officer Macisso perceived Norton as moving continuously in the direction of Officer Corbett.  Although Norton was initially positioned to the left front of Officer Macisso, Norton's continued movement left Norton positioned to Macisso's right.  Officer Macisso made the decision to fire, and did fire, after he moved forward two or three feet from his original position and reacquired sight of Michael Norton.  Officer Macisso allowed himself only a second or less to aim and fire from the time he re-positioned himself to evaluate the threat posed by Norton.

At this point, Officer Macisso, who was stationed in the tree line, believed Norton, still armed with knives, was well within twenty-one feet of Officer Corbett.  Officer Macisso perceived Norton as approximately fifteen feet from Officer Corbett and instinctively felt that distance was too close.  Based on that belief, Officer Macisso believed the use of deadly force was justified and he shot Norton with his rifle.  The video captures Norton falling to the ground the moment after the shot is fired.  According to Plaintiff's own accident reconstruction expert, at the moment he was shot, Michael Norton was standing between 15.28 feet to 19.37 feet from the right rear corner of the parked truck that had been used as cover for Officer Corbett.

From his new position in the tree line between Officer Macisso and Officer Todd, Officer Sutton caught his first view of Norton a few steps from the rear of the residence.  Sutton observed Norton walking away from the house and toward the positions of Officers Corbett and Maynard behind the house.  Once Norton started moving, foliage from the trees obscured Officer Sutton's view of him.  Officer Sutton was forced to move again.  Officer Sutton moved first to his left and then his right as he tried to get into position to fire the bean bag shotgun.  As Officer Sutton was trying to get into position, he continued to hear Officers Maynard and Corbett commanding Norton to drop the knife.  From the tone of Officers Maynard and Corbett's voices, Officer Sutton could tell the situation was becoming more tense.  As soon as Officer Sutton reached his second position and could see Norton, he fired the bean bag round.  Officer Sutton fired for the sole purpose of getting Norton to drop the knives per the instructions being shouted at him.  In explaining his decision to fire, Officer Sutton said he was drawn to fire based on where Norton was in relation to the truck and Sutton's belief that Corbett was positioned at the corner of the truck.

Officer Sutton heard Macisso's firearm discharge at the same time he fired the bean bag shotgun.  Officer Macisso never heard any shot fired prior to shooting his own rifle; he later learned that Officer Sutton had also fired the bean bag shotgun at the same time that he had fired his rifle.  No other shots were fired by any of the other officers at the scene.[8]

Lieutenant Bernard recalls hearing a shot at the point Norton resumed moving followed by announcements by both Officer Macisso and Officer Sutton that they had fired.  From his position, Chief Googins heard what sounded to him to be a single gunshot.  As a result, he went to the driveway to call for rescue.

---

[8] Officer Macisso did know that other officers in his immediate vicinity, including Officer Todd and Officer Maynard, were carrying either rifles or handguns.

### 3.  Post-Shooting

On the Norton Exiting Video, Officer Maynard appears in the video stepping towards the area where Norton fell with her flashlight aloft approximately twenty seconds after Norton is seen falling to the ground.  (Norton Exiting Video 2:05.)  Then, Officer Sutton can be seen approaching with the bean bag shotgun.  (Norton Exiting Video 2:07.)  Then, Lieutenant Bernard can be seen stepping into the driveway, coming up behind Officer Sutton.  (Norton Video Excerpt 2:18.)  As the officers approached Norton after he was shot, they observed two knives, one with an approximately eight inch blade, and the other with an approximately three and a half inch blade, still in close proximity to Norton as he lay on the ground.  Because one of the knives was still in close proximity to Norton, Officer Sutton and Lieutenant Bernard can be seen grabbing Norton's legs and pulling him a few feet so the knives were out of his reach.  (Norton Exiting Video 2:29-2:31.)

Recalling the shooting incident, Officer Macisso estimated that Norton was approximately 15 feet away from Officer Corbett when he fired.  Officer Macisso did not know why Officer Corbett had not already fired, and considered the possibility that Officer Corbett was having a weapon malfunction.  From Lieutenant Bernard's perspective, directly behind Officer Macisso, Lieutenant Bernard believed that Officer Corbett was being approached at a short distance by a man armed with two knives who had expressly stated his plan to rush at an officer with a knife and "get violent."

### 4. The Command Van Video

Norton's shooting was also recorded on an infared camera located atop the command van (the "Command Van Excerpt"). The command van video was shot from the tree line adjacent to the driveway of the Norton residence. Although you can see multiple officers positioned in the tree line, you do not see Norton.[9]   Officer Sutton can be seen on the Command Van video excerpt on the DVD as the first officer to run along the tree line, passing behind Officer Macisso's position in the tree line. (Command Van Video 00:19.) Lieutenant Bernard can be seen passing to the rear of the tree line and then following Officer Sutton into the trees to seek a vantage point from which he could observe Norton. (Command Van Video 00:22-00:25.) In the ensuing seconds, the last two members of the contact team can be seen coming to the rear of Officer Macisso's position. As the SRT contact team tries to get into position, Officer Macisso stayed with his rifle trained in the direction of Norton. Lieutenant Bernard can be seen stepping back out of the trees and moving directly behind Officer Macisso. (Command Van Excerpt 00:33.) At that same time, Officer Sutton can be seen briefly stepping out of the trees directly behind Officer Macisso and then moving back to his right into the trees as he continued to seek a position from which he could observe Michael Norton. Norton remained under the deck of the residence. After Norton exited from under the deck and resumed moving, Officer Macisso's view of him was obscured by foliage in the tree line in front of him. On the Command Van Video, Officer Macisso can be seen moving from his original position and pushing foliage out of his way to observe Michael Norton. (Command Van Video 00:39.)

---

[9] To the extent Defendants assert that the infared video depicts Norton as a "bright white" spot, Plaintiff disputes Defendant's interpretation of the thermal imaging contained on the video. For purposes of summary judgment, the Court construes the facts in the light most favorable to Plaintiff and makes no inference as to what or who is depicted as the "bright white" spot on the Command Van Video. (See Pls. Response SMF ¶¶ 263-265; 399-401.)

### D.  The Undisputed Opinions and Analysis by Defendant's Expert[10]

Defendants designated Kevan J. Dugan as an expert witness in this case.  Dugan is a Captain in the Pennsylvania State Police serving in the capacity of Director, Tactical Operations Division within the Bureau of Emergency and Special Operations.[11]   Captain Dugan has reviewed the applicable policies and procedures of the South Portland Police Department as well as the following materials related to the Norton Standoff:  the Attorney General's investigative files, audio/video materials, officers' statements and reports, deposition transcripts of all participants in the events who have been deposed, all other materials produced in this litigation, and interviewed the involved SPPD officers.

According to Dugan, standard SWAT practices with emotionally disturbed persons would be to use time appropriately and to slow the process down as much as possible to try to allow crisis intervention techniques to work.  In a suicide by cop situation, however, police are often forced to react to the suspect's actions.  The priority in decision making is to protect the lives of hostages/bystanders, the police, and the suspect/subject, respectively, and tactical team

---

[10] The Court notes that Plaintiff has also designated an expert, Melvin Tucker, a retired law enforcement officer.  To the extent that Plaintiff has offered any opinions of its expert in its Statement of Additional Facts (Docket # 32) (Pl. Add'l SMF) and Defendant has admitted those statements in its Reply (Docket # 37), the Court has included them in its discussion.  However, the Court notes that it has not included the opinions of Tucker to the extent that they are denied and otherwise properly objected to by Defendants.  (See Pl. Add'l SMF ¶¶ 9, 41, 43 & 44.)

[11] Plaintiff does not dispute that Dugan has the following qualifications that support his designation as an expert:

Captain Dugan oversees the Pennsylvania State Police Special Emergency Response Teams throughout the entire State of Pennsylvania.  He is a tactical instructor for the Pennsylvania State Police SERT and an instructor in SWAT Command and Decision Making for the National Tactical Officers Association, having taught throughout the United States and South America.  Captain Dugan also serves on the Board of Directors of the National Tactical Officers Association.  Serving as a tactical team member, team leader, assistant coordinator and coordinator of the Pennsylvania State Police Special Emergency Response Team West, from 1992 to 2005, Captain Dugan directly participated in over 500 tactical operations.  Since 2008, as Director of the Tactical Operations Division, Captain Dugan has analyzed and adjudicated the decision making and actions of SERT members who have used force during tactical operations on 60 occasions, including decisions to use noise flash diversionary devices, chemical agents, Tasers, less lethal munitions, explosive breaching, and deadly force.  Captain Dugan is an instructor for the National Tactical Officers Association, including instructing officers on the "suicide by cop" phenomenon.

leaders are trained that no decision should be made that elevates the value of the suicidal suspect's life over any others' lives.

According to Dugan, the SPPD policies, including use of force, dealing with emotionally disturbed persons, dealing with hostage/barricaded subject situations, and Special Response Team, are very consistent with similar policies and procedures Captain Dugan is familiar with through his work with the Pennsylvania State Police and policies promulgated by the International Association of Chiefs of Police.

Captain Dugan has also reviewed the training record of Officer Macisso as well as the training records of the SPPD's SRT.  According to Dugan, the SPPD SRT's training records show appropriate use of force scenario training, including some specific scenarios with edged weapons and suicidal subjects, as far back as 2002.  The records also show Officer Macisso participated in all of the SRT training since joining the SRT in April 2005.  In general, the amount and type of training these records document is consistent with training provided by other law enforcement agencies with which Captain Dugan is familiar, including the Pennsylvania State Police and the National Tactical Officers Association.

Captain Dugan offers the following analysis of the Norton standoff as part of this expert testimony:

Lieutenant Bernard, the SRT Commander, established a containment perimeter as officers arrived on the scene and while awaiting arrival of requested crisis negotiators.  When the first negotiator could not establish a rapport with Norton, a second crisis negotiator was used, with better results.  As more manpower arrived at the scene, a perimeter was put in place which included officers equipped with Tasers and a bean bag shotgun on the perimeter.  Because of a lack of information about the status of Kari Vance in the residence with Norton, the supervisors

29

properly regarded this as a possible hostage situation until she exited the home. Lieutenant Bernard set up a deliberate action team in case it became necessary to force their way into the residence in response to a perceived threat to Vance's safety.   When Norton refused to communicate by phone, Lieutenant Bernard continued efforts to communicate with him by addressing him over a cruiser's public address system.  Lieutenant Bernard instructed Norton to come out of the residence via the front door where he had a less lethal alternative, the bean bag shotgun, in place.  Any officer stationed on the perimeter with a less lethal weapon would have to be accompanied by an officer who could provide lethal cover should the less lethal alternative fail to incapacitate the suspect.  Although Lieutenant Bernard had stationed the bean bag shotgun at the front of the house, expecting that Norton might be persuaded to follow his instructions that he exit the house via the front door, when Norton unexpectedly exited through a lower level rear door, armed with knives and refusing to disarm, Lieutenant Bernard quickly directed that the bean bag shotgun redeploy to that area.  While redeploying the bean bag shotgun, Lieutenant Bernard alerted the officers in the rear of the house that the less lethal option was coming to them.  Despite a standoff that exceeded four hours in duration, no steps were taken that provoked a confrontation between the police and Norton.

## III.     DISCUSSION

Plaintiff's Complaint (Docket # 1) contains four claims:  Violation of 42 U.S.C. § 1983 (Count I); Violation of the Maine Civil Rights Act, 5 M.R.S.A. § 4682 (Count II); Battery (Count III); and Violation of Title II of the American with Disabilities Act (ADA), 42 U.S.C. §§ 12131-12165 (Count IV).  Defendants have moved for summary judgment on all of these claims. In response, Plaintiff explicitly argues against summary judgment only as to Count I and indicated he would not oppose a grant of summary judgment on Counts II and III.[12]  As a result, the Court focuses its analysis on Plaintiff's claims that Defendants violated the ADA and various constitutional rights.   As to these claims, Plaintiff's Complaint contains references to "Defendants" without explicitly indicating whether these claims are stated against Defendant City of South Portland (the "City"), Defendant Edward Googins ("Chief Googins"), Defendant Todd Bernard ("Lieutenant Bernard"), and/or Defendant Benjamin Macisso ("Officer Macisso").[13]  Therefore, the Court proceeds on the assumption that Plaintiff intended to state the claims contained in Counts I and IV against all four defendants.[14]

---

[12] The Court notes that Plaintiff's Response contains an apparent typo indicating that he does not oppose a grant of summary judgment on "Counts II and II." (Pl. Response (Docket # 33) at 1.)  Given the overlap of the ADA-related claims in Counts I and IV, the Court addresses the ADA argument and reads Plaintiff's Response as not opposing summary judgment on the other two counts.  The Court notes that in Defendant's Response to Plaintiff's related Motion for Sanctions, Defendant indicated that "in responding to the summary judgment motion, Plaintiff abruptly abandoned three of the four counts of his Complaint." (Defs. Response to Mot. for Sanctions (Docket # 39) at 3.) Plaintiff's Reply (Docket # 40) made no attempt to correct this assertion.  (See also Defs. Reply (Docket # 36) at 1.)

[13] In this Order, Chief Googins, Lieutenant Bernard, and Officer Googins are sometimes collectively referred to as the "Individual Defendants."

[14] Likewise to the extent Defendant's Motion argues that claims referencing SPPD must be considered as claims against the City because SPPD does not have the legal capacity to be sued as a stand-alone entity, the Court construes references to SPPD to invoke claims against the City of South Portland, which Plaintiff properly named as a defendant.  (See Defs. Mot. for Summ. J. (Docket #12) at 2-3.)

### A.   ADA Claims

Count IV asserts a violation of Title II of the Americans with Disabilities Act.[15]   To prevail on a Title II claim, a plaintiff bears the burden of proving:

> (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability.

Buchanan v. Maine, 469 F.3d 158, 170-171 (1st Cir. 2006) (citing Parker v. Universidad de Puerto Rico, 225 F.3d 1, 5 (1st Cir. 2000)).

The Court's analysis of the ADA claims necessarily begins by clarifying which Defendants are properly the subject of such a claim.  As correctly noted by Defendants, Title II of the ADA is applicable only to governmental entities, not individual government employees. Thus, all of the Individual Defendants are entitled to summary judgment on Count IV.  See, e.g., Ms. K v. City of South Portland, 407 F. Supp. 2d 290, 296 & n.3 (D. Me. 2006) (collecting cases); Vincent v. Scarborough, No. 02-cv-239-P-H, 2003 WL 22757940 at *23 (D. Me. Nov. 20, 2003) (recommended decision subsequently adopted by the District Court on Dec. 19, 2003).

To the extent Plaintiff's Complaint can be read as stating an ADA claim against the City, it is clear there is no trialworthy issue in light of the record presented.  First, the record contains no evidence to support a finding that Michael Norton qualifies as a disabled person under the ADA.  (See Pl. Response to Defs. SMF (Docket # 23) at ¶¶ 482-484.)  Second, even if Plaintiff could establish that Michael Norton was a qualified individual under the ADA, the Court is satisfied that this case would fall under the exigent circumstances exception.  See Buchanan v.

---

[15] Additionally, Defendants appear to read Count I to also be stating a claim under the ADA to the extent that the statute is referenced in Count I.  (See Compl. ¶ 29.)

<u>Maine</u>, 417 F. Supp. 2d 45, 73 (D. Me. 2006) (collecting cases).  In short, the Court finds all of the Defendants are entitled to summary judgment on Plaintiff's ADA claims.

### B.   42 U.S.C. § 1983 (Count I)

Count I of Plaintiff's Complaint alleges a violation of 42 U.S.C. § 1983 by all Defendants claiming that they violated Michael Norton's rights under the Second and Fourth Amendments.[16] Given the different roles played by each of the Defendants, Plaintiff invokes a number of theories of liability and the Court addresses each in turn.

### 1.   Qualified Immunity

In connection with each theory of liability stated against the Individual Defendants, each predictably invokes qualified immunity.   As the Supreme Court explained in <u>Pearson v. Callahan</u>, 555 U.S. 223 (2009):

> The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'  <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.' <u>Groh v. Ramirez</u>, 540 U.S. 551, 567 (2004) (KENNEDY, J., dissenting) (quoting <u>Butz v. Economou</u>, 438 U.S. 478, 507 (1978), for the proposition qualified immunity covers 'mere mistakes in judgment, whether the mistake is one of fact or one of law').

---

[16] Although Plaintiff's Complaint also contains a reference to the Fourteenth Amendment, Plaintiff appears to have abandoned any separate Section 1983 claim based on the Fourteenth Amendment.  (<u>See</u> Pl. Response (Docket # 33) at 11-24.) In any event, Plaintiff's excessive force claim does not provide a basis for an alternative "deprivation of life" claim that can be separately analyzed under the Fourteenth Amendment.  <u>See</u> <u>Estate of Bennett v. Wainwright</u>, 548 F.3d 155, 163-67 (1st Cir. 2008).

Pearson, 555 U.S. at 231.  To pass over the qualified immunity hurdle, Plaintiff must establish (1) a violation of a constitutional right and (2) that the right was clearly established at the time of the violation.  See, e.g., Haley v. City of Boston, 657 F.3d 39, 47 (1st Cir. 2011).  Failure to satisfy either prong can result in a court finding a defendant's actions are entitled to qualified immunity.  Thus, in the discussion that follows, the Court will, as necessary, consider and indicate whether the Individual Defendants are entitled to qualified immunity.

### 2.  Second Amendment

Plaintiff cites District of Columbia v. Heller, 554 U.S. 570, 581 (2008) and MacDonald v. City of Chicago, 561 U.S. ---, 130 S. Ct. 3020, 3026 (2010) for the proposition that Michael Norton had a constitutional right to keep and bear knives for any lawful purpose on August 24, 2008.  Plaintiff asserts that Defendants violated his Second Amendment rights by using deadly force to disarm him in his driveway on the night in question.  Plaintiff further argues that there is a genuine issue of material fact as to whether Norton's possession was unlawful.

The undisputed facts establish that Norton was using the knives on the night in question to threaten the use of deadly force against a police officer; such use violates Maine law.  See 17-A M.R.S.A. § 110.  The Second Amendment does not protect such an unlawful use of knives.  In short, the Court cannot find a trialworthy issue with respect to Norton's lawful possession of knives in the moments before his death.  Therefore, on the record presented, the Court finds no violation of Michael Norton's Second Amendment rights.

Assuming for the sake of argument that there were a trialworthy issue with respect to Norton's lawful possession of knives, the individual defendants would be entitled to qualified immunity.  The Court readily and necessarily admits that the precise contours of the Second

Amendment rights of persons with mental illness may present difficult questions.   See, e.g., Heller, 554 U.S. at 626 ("[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by . . . the mentally ill.")   However, these questions need not be answered in this case.   Rather, this case is readily resolved on the "clearly established" prong of the qualified immunity analysis.   Heller, the first Supreme Court case on which Plaintiff relies, was decided just two months prior to the night in question.   See Heller, 554 U.S. at 570 (decided on June 26, 2008).   MacDonald, the second case, which first held that the Second Amendment rights enunciated in Heller were applicable to the states, was decided almost two years after the night in question. MacDonald, 130 S. Ct. at 3020 (decided June 28, 2010).   Thus, under no circumstances was Norton's right to bear knives in his driveway clearly established in August 2008.   See Pearson, 555 U.S. at 237 (explaining that there are "cases in which it is plain that a constitutional right is not clearly established").

### 3.   Fourth Amendment

Whether the use of deadly force violated an individual's Fourth Amendment rights is determined by considering whether the officer's conduct was "objectively reasonable." Graham v. Conner, 490 U.S. 386, 397 (1989); see also Tennessee v. Garner, 471 U.S. 1, 3 & 7 (1985) (requiring "probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others" to justify the use of deadly force).   "[T]he Supreme Court's standard of reasonableness is comparatively generous to the police in cases where potential danger, emergency conditions or other exigent circumstances are present."   Roy v. Inhabitants of City of Lewiston, 42 F.3d 691, 695 (1st Cir. 1994)

In the context of qualified immunity, the same "objectively reasonable" standard is used. See Roy, 42 F.3d at 695 (noting that the same standard applies to both substantive liability and qualified immunity in excessive force cases). Therefore, qualified immunity will shield an officer's objectively reasonable use of deadly force. See Berube v. Conley, 506 F.3d 79, 82-83 (1st Cir. 2007); see also Anderson v. Creighton, 483 U.S. 635, 638, 641 (1987) (noting that immunity protects "all but the plainly incompetent or those who knowingly violate the law") (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986) (internal quotation marks omitted)). As the First Circuit explained in Estate of Bennett v. Wainwright, 548 F.3d 155 (1st Cir. 2008):

> Thus, "police officers are entitled to qualified immunity if reasonably well-trained officers confronted with similar circumstances could reasonably believe their actions were lawful under clearly established law." Napier v. Windham, 187 F.3d 177, 183 (1st Cir.1999); see also Saucier v. Katz, 533 U.S. 194, 205 (2001) ("If the officer's mistake as to what the law requires is reasonable ... the officer is entitled to the immunity defense"). Applying this standard on review of summary judgment, our ultimate inquiry becomes whether a reasonable factfinder could conclude that the defendants' conduct was "so deficient that no reasonable officer could have made the same choices under the circumstances."

Bennett, 548 F.3d at 168.

### a.  Officer Macisso

Officer Macisso's actions "cannot be found unreasonable because [he] may have failed to perfectly calibrate [the timing and] the amount of force required to protect [Officer Corbett]." Berube, 506 F.3d at 85. Ultimately, Officer Macisso's decision to use lethal force reflected his assessment of the distance between Corbett and Norton as well as all of the other information Macisso had received during the course of the standoff.

With respect to the distance between Corbett and Norton, Plaintiff argues that no reasonably well-trained officer would have believed that Norton was close enough to justify the use of lethal force. At the time Officer Macisso shot Norton, Macisso subjectively believed that

Norton, still armed with knives, was approximately fifteen to twenty-one feet away from Officer Corbett and continuing to move closer to Corbett.  Plaintiff's own accident reconstruction expert provided similar estimated measurements of the distance separating the two men.  The undisputed evidence additionally establishes that officers are trained to use twenty-one feet as a guideline for when to use lethal force against a person armed with a knife.  Notably, Officer Sutton's decision to fire his bean bag shotgun at the same moment indicates that Sutton has similarly concluded that Norton was close enough to justify the use of lethal force.[17]  See Lopera v. Town of Coventry, 640 F.3d 388, 396 (1st Cir. 2011) ("[I]mmunity will issue when officers of reasonable competence could disagree . . ., but it will not issue if it is obvious that no reasonably competent officer would have concluded that the action was lawful.") (internal quotation omitted).

Officer Macisso's instinctive belief that Norton was too close to Corbett reflected not just his reasonable perception of the distance separating the two men but also all of the other information provided during the standoff and the conditions at the scene.  Given this totality of circumstances, any reasonable officer on the scene would necessarily have perceived Michael Norton as acting expressly in accordance with his stated plan, which was to "get violent" and do whatever was necessary to make officers use deadly force against him.  See, e.g., Estate of Larsen v. Murr, 511 F.3d 1255, 1261 (10th Cir. 2008) (affirming a grant of qualified immunity to officer who used deadly force against an agitated, suicidal man holding a large knife when the distance between the man and the officer was between seven and twenty feet).

---

[17] Although considered a "less lethal" weapon, Sutton believed he could only fire the bean bag shotgun if lethal force was justified.  The Court necessarily acknowledges that other armed officers did not fire when Macisso and Sutton did.

On the record before the Court, Officer Macisso's use of deadly force under the circumstances appears objectively reasonable and, at the very least, is entitled to qualified immunity.

### b.  Lieutenant Bernard

Although Lieutenant Bernard did not personally use deadly force against Norton or explicitly order the use of deadly force against Norton, Plaintiff argues that his Section 1983 claim against Lieutenant Bernard is based on his "on-scene control-and-command decisions." (Pl. Response at 22.) The undisputed evidence establishes that Lieutenant Bernard, the SRT Commander, was responsible for scene tactics and plans on the night of the Norton standoff. Plaintiff asserts that in this capacity Bernard established "an inherently dangerous environment, . . . in which maximum lethal and minimum non-lethal force was arrayed and . . . little or no guidance or instruction was given to officers . . . as to when and under what circumstance lethal force would be used against Norton." (Id.)[18]

The First Circuit has held that the "availab[ility]" of "other means . . . to subdue" a person "does not establish that the officers' actions were unreasonable."  Berube, 506 F.3d at 85. In this case, Lieutenant Bernard's plan for taking Norton into protective custody was premised on coaxing Norton to come out the front door of the his home.  As a result, Bernard stationed his SRT contact team with less lethal force at the front of the house.  When things did not go as planned because Norton refused to follow directions, Bernard quickly redeployed his contact team to Norton's location at the rear of the house.  Lieutenant Bernard's actions "cannot be

---

[18] To the extent Plaintiff's argument can be read as asserting the same exact theory of liability against Chief Googins, the Court concludes that Chief Googins is entitled to summary judgment on this theory of liability.  Given the undisputed facts, any recovery from Chief Googins for the on-scene planning would necessarily be predicated on a *respondeat superior* theory.  See Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1948 (2009) ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*. . . . [A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.")

found unreasonable because [he] may have failed to perfectly calibrate" a plan for the use of less lethal force against an unpredictable, suicidal person.  Berube, 506 F.3d at 85; see also Graham, 490 U.S. at 39 (noting that reasonableness cannot be judged "with the 20/20 vision of hindsight").

On the summary judgment record, the Court finds no Fourth Amendment violation attributable to the conduct of Lieutenant Bernard and alternatively concludes that Bernard's conduct is entitled to qualified immunity.

### c.  Chief Googins

In general, a supervising officer may only be liable under § 1983 if

(1) the behavior of [his] subordinates results in a constitutional violation, and (2) the [supervisor]'s action or inaction was affirmative[ly] link[ed] to that behavior in the sense that it could be characterized as supervisory encouragement, condonation or acquiescence or gross negligence amounting to deliberate indifference.

Bennett, 548 F.3d at 176 -177 (quoting Pineda v. Toomey, 533 F.3d 50, 54 (1st Cir.2008) & Lipsett v. Univ. of P.R., 864 F.2d 881, 902 (1st Cir.1988)).  Quite simply, the record presented does not create a trial worthy issue on either of these two elements and the Court finds that Chief Googins is entitled to summary judgment for that reason.  The Court alternatively notes that it finds that Chief Googins' actions and inactions to the extent they have been made part of the record were objectively reasonable.  Therefore, the Court would also find that Chief Googins is entitled to qualified immunity.

### d.  Failure to Train

Plaintiff also asserts that Officer Macisso was improperly trained to believe that there was a "21-foot free fire zone" around him and his fellow officers.  (Pl. Response at 22.)  As a result, Plaintiff argues the City, Lieutenant Bernard and Chief Googins are liable under Section 1983 for failure to properly train on the use of deadly force.  (Pl. Response at 22.)

Claims against municipalities that allege a failure to train succeed "[o]nly if the failure to train 'amounts to *deliberate indifference* to the rights of persons with whom the police come into contact,' and is 'closely related' to, or 'the moving force' behind, the constitutional injury." Hayden v. Grayson, 134 F.3d 449, 456 (1st Cir. 1998) (quoting City of Canton v. Harris, 489 U.S. 378, 388-89 (1989) (emphasis added)).  "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Connick v. Thompson, 131 S. Ct. 1350, 1360 (2011) (quoting Board of Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 410 (1997)).  A supervisor or policymaker must have "actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights [to] . . . be deemed deliberately indifferent." Id. (citing Bryan Cty., 520 U.S. at 407).

First and foremost, this theory of liability misstates the record with respect to what Officer Macisso took away from his training on dealing with persons carrying edged weapons.[19] However, assuming that Macisso actually believed there to be a "21-foot free fire zone" or some other inaccurate standard for the use of deadly force, Defendants would still be entitled to summary judgment on Plaintiff's failure to train claim.  In the absence of a finding that Officer Macisso's use of deadly force amounted to a constitutional violation, there can be no liability for "allegedly inferior" training.  Calvi v. Knox County, 470 F.3d 422, 429  (1st Cir. 2006) (finding no municipal liability on a failure to train claim when no "constitutional injury has been inflicted by the officer or officers whose training was allegedly inferior").

---

[19] In his deposition, Macisso indicated that he understood that the legal limits on the use of deadly force included the similarly situated reasonable officer standard.  He also indicated that based on his training he believed an officer could use deadly force if someone armed with a knife refused to relinquish the knife and was within 21 feet of the officer or any another innocent third party.  (See Macisso Dep. (Docket # 30) at 20-23; see also Macisso Aff. (Docket # 15) ¶ 6.)

Additionally, Plaintiff has not produced any evidence suggesting that the "21-foot free fire zone" is a view held by other officers who have attended the same training sessions; nor has Plaintiff attempted to show a pattern of excessive force or deadly force violations.  See Calvi, 470 F.3d at 429 ("Showing that a single individual received inadequate training is insufficient for municipal liability to attach; the training program as a whole must be found faulty."); Young v. City of Providence, 404 F.3d 4, 27 (1st Cir. 2005) ("[A] training program must be quite deficient in order for the deliberate indifference standard to be met: the fact that training is imperfect or not in the precise form a plaintiff would prefer is insufficient to make such a showing.").  In short, Plaintiff has not produced evidence from which a jury could infer that the City, Lieutenant Bernard or Chief Googins had actual or constructive notice of any general deficiency in the SPPD training on the use of deadly force.  Moreover, Plaintiff has not produced evidence from which a jury could conclude that prior to the Norton standoff the City, Lieutenant Bernard or Chief Googins had actual or constructive notice of any particular deficiency in Officer Macisso's training on the use of deadly force.

### 4.   Municipal Liability

To the extent that Plaintiff seeks to hold the City responsible for any alleged violations of his constitutional rights, it faces a high hurdle.  See Connick, 131 S. Ct. at 1359.  Under 42 U.S.C. § 1983, municipalities "cannot be held vicariously liable in an action under section 1983 unless its official policy or custom was the 'moving force' behind the alleged violation of constitutional rights."  Hayden v. Grayson, 134 F.3d 449, 456 (1st Cir. 1998) (citing Monell v. Dept. of Social Servs. of New York, 436 U.S. 658, 694 (1978)).

Incorporating all of the relevant portions of the above analysis of Plaintiff's Section 1983 claim, the Court concludes that the City is entitled to summary judgment on the Section 1983 claims for multiple reasons.  First, in the absence of finding that the officers involved violated Norton's constitutional rights, there can be no municipal liability.  See City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point.") (emphasis in original). Second, there is no evidence to support a finding that any official policy or custom served as the basis or moving force behind Officer Macisso's use of deadly force.  Third, Plaintiff has not attempted to show that SPPD had a pattern of similar violations prior to August 2008 and has failed to present a trialworthy issue that the City's policies reflect a deliberate indifference to the constitutional rights of the mentally ill.

Ultimately, the First Circuit has repeatedly explained that the "calculus of reasonableness must make allowance for the need of police officers to make split second judgments—in circumstances that are tense, uncertain and rapidly evolving—about the amount of force that is necessary in a particular situation."  Parker v. Gerrish, 547 F.3d 1, 9 (1st Cir. 2008) (quoting Berube, 506 F.3d at 83 & Roy, 42 F.3d at 695) (internal quotation marks omitted); see also Roy, 42 F.3d at 695 (explaining that "police who make these on-the-spot choices in dangerous situations [have] a fairly wide zone of protection in close cases").  On the record presented, Officer Macisso's decision to fire his rifle was based on his individual but objectively reasonable assessment of the unique circumstances presented.  In hindsight, Plaintiff understandably has "plausible" arguments that "the situation could have been handled differently."  Roy, 42 F.3d at

695; see also Buchanan v. Maine, 417 F. Supp. 2d at 58-59 (similarly quoting Roy).  However, such arguments do not amount to a constitutional violation.


**IV.    CONCLUSION**

For the reasons just explained, Defendants' Motion for Summary Judgment is GRANTED WITHOUT OBJECTION as to Counts II & III and GRANTED as to Counts I & IV. Judgment shall enter in favor of Defendants on all counts.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 9th day of December, 2011.